

**EOD**

03/15/2007

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KAREN SUE POE, | § | Case No. 04-43825 |
| | § | (Chapter 7) |
| Debtor. | § | |
| _____ | § | |
| KAREN SUE POE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 04-4279 |
| | § | |
| EDUCATIONAL CREDIT | § | |
| MANAGEMENT CORPORATION, | § | |
| | § | |
| Defendant. | § | |

### <u>MEMORANDUM OPINION</u>[1]

Karen Sue Poe ("<u>Poe</u>") initiated this adversary proceeding against

Educational Credit Management Corporation ("<u>ECMC</u>") seeking a determination

of the dischargeability of student loans guaranteed by ECMC.  Poe seeks a

determination that repayment of the loans constitutes an undue hardship under 11

U.S.C. §523(a)(8).  Trial was held on June 16, 2006.  Upon consideration of the

pleadings, the evidence presented, and the arguments made at trial, the Court

makes the following findings of fact and conclusions of law:[2]

---

[1] This Memorandum Opinion is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case, or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

[2] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

# I. JURISDICTION

1.      This Court has jurisdiction to consider the Complaint pursuant to 28 U.S.C. §§ 1334 and 157(a).  This Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (I), and (O).

# II. FINDINGS OF FACT

## A. Medical and Educational History

2.      Poe was born on May 24, 1964 and endured an unhappy childhood. She graduated from high school in 1982.  She obtained an associates degree from Eastfield College in 1986 and a bachelor's degree in finance from Texas A&M University in December 1988.

3.      Poe suffered a nervous breakdown in 1989.  According to Poe, the breakdown occurred as a result of feeling overwhelmed in her first job as an accountant at Shell Oil Company.  Poe spent most of the next two years in bed while her mother cared for her.  Poe occasionally worked on a temporary basis as an office assistant during this period, earning approximately $15 an hour.

4.      Poe did not receive treatment for her condition until 1991, when she was hospitalized for clinical depression for three weeks at Parkland Memorial Hospital in Dallas, Texas.  She was then sent to a half-way house for five months for further recovery.  Poe has taken psychotropic medications continually since her hospitalization in 1991.

5.      In November 1991, Poe began working at an architectural firm

called John S. Chase, FAIE, Architect, Inc.  She started as a clerical worker earning approximately $10 an hour.  While she was employed at the architectural firm, Poe attempted suicide in 1993 and again in 1994 by overdosing on medication.  Poe took some time off work after each attempted suicide.

6.     In 1996, Poe enrolled in a "part-time MBA" program at Southern Methodist University in Dallas, Texas.  Poe began the program in 1996, but took off for a couple of semesters due to feelings of depression and stress.  In June 1998, Poe quit her job at the architectural firm.  Poe testified that she felt stressed by the overtime she was being asked to work and that she believed that her job was interfering with her studies.

7.     At the time she left the architectural firm, Poe's job title was "secretary," and she was earning an annual salary of $30,000 (inclusive of overtime).  After leaving the architectural firm, Poe worked for several staffing agencies from July 1998 through March 1999, earning approximately $16-17 an hour as a temporary accountant.  From March 1999 through March 2000, Poe worked for W.M.O. Dannhamsen Corp., earning $12 an hour as a news editor for two trade magazines.

8.     Poe obtained a masters degree in business administration in December 1999.  She began working for J.P. Morgan Chase Bank in April 2000.  She was hired as a team leader and supervised several fund accountants.  Her starting salary was $45,000.

9.     Poe described her first manager at J.P. Morgan Chase Bank as

"fatherly" and supportive.  After her manager was laid off in or around December 2001, Poe began to behave erratically at work.  Poe checked herself into the hospital at Richardson Regional Medical Center, where she was treated by Dr. Paul Hamilton for bi-polar disorder.  She was discharged in December 2001.

10.     In January 2002, Poe received a job evaluation from J.P. Morgan Chase Bank for the prior year ending December 31, 2001.  Poe uniformly received a "very good" evaluation on the assessed skills and achievements.  This is the only evaluation Poe received while at the bank; Poe testified that she purposefully avoided evaluations.

11.     From August 28, 2002 through September 2, 2002, Poe was hospitalized due to increased suicidal thoughts.  She returned to work in September 2002, but complained to Dr. Hamilton of feeling "stressed out."  When Dr. Hamilton stopped accepting Poe's insurance, Poe began seeing Dr. Luke Peris. In July 2003, Dr. Peris diagnosed Poe as suffering from bi-polar disorder with the most recent episode being depressed.

12.     Poe was re-assigned to the area of quality control at J.P. Morgan Chase Bank where she helped to prepare government reports.  In early 2004, she was moved to derivative accounting.  Poe felt overwhelmed by her new job, and she turned to her subordinates for instructions.

13.     Poe's next visit with Dr. Peris was on June 9, 2004, as she prepared for gastric bypass surgery.  Poe reported symptoms of depression to Dr. Peris throughout the summer of 2004.

<u>MEMORANDUM OPINION</u> – Page 4

14.     After undergoing gastric bypass surgery, Poe lost approximately 100 pounds.  She subsequently regained some of the weight and remains obese.  She has a history of sleep apnea.  Her physical ailments also include migraine headaches, asthma, hypothyroidism, spinal stenosis and lumbar disk disease.  Poe testified that, because of her various physical ailments, she is unable to stand on her feet for long periods of time.

15.     On August 18, 2004 (the "Petition Date"), Poe filed a petition for relief under Chapter 7 of the Bankruptcy Code.[3]  Poe was laid off by J.P. Morgan Chase Bank shortly after filing for bankruptcy.  Poe reported to Dr. Peris that she was having suicidal thoughts in August 2004.

16.     In or around September 2004, Poe was re-hired by J.P. Morgan Chase Bank.  However, by late September 2004, Dr. Peris observed that she was exhibiting significant traits of a personality disorder.  Poe was hospitalized again in October 2004 after attempting suicide.

17.     In October 2004, Dr. David Cobbs conducted a neuropsychological evaluation of Poe.  In his report, Dr. Cobbs described Poe as a "very capable woman," apparently based on her education and employment with J.P. Morgan Chase Bank.  Although Poe functioned normally in many areas, Dr. Cobbs found mild to moderate dysfunction on certain tasks primarily related to speed, precision and efficiency of cognitive processing.  Dr. Cobbs found no neurological cause for

---

[3] Poe's unsecured debt at the time she filed for bankruptcy totaled $109,459.01.  Of this amount, $65,167.86 was for her student loans.

**MEMORANDUM OPINION** – Page 5

Poe's condition.

18.     In November 2004, Poe took a medical leave of absence from her job at J.P. Morgan Chase Bank.  From November 2004 through January 2005, Poe was hospitalized several more times due to depression, inability to function, and preoccupation with thoughts of suicide.  She repeatedly stated to Dr. Peris, who was her treating physician at this time, that she did not believe she could return to work.  Dr. Peris' treatment notes indicate that he believed Poe wanted to be assessed as disabled so that she would not be required to return to work.  Dr. Peris' treatment notes also indicate that he believed Poe's statements about her inability to work were "clearly manipulative."

19.     In December 2004, Poe attempted suicide again by taking an overdose of medication.

20.     In addition to her suicide attempts, Poe has reported auditory hallucinations in the form of voices instructing her to injure herself.  Poe has a history of cutting and scratching herself – her medical records reflect that her left forearm is scarred from multiple lacerations.  Poe's medical records also reflect that she overeats as a mechanism for coping with depression.

21.     In January 2005, Dr. Peris referred Poe to Dr. Michael Rosenthal, a psychotherapist, for treatment.  Poe was distressed at being transferred to yet another doctor for treatment.

22.     Dr. Rosenthal initially diagnosed Poe as suffering from bi-polar disorder.  However, after observing that Poe did not experience any "high"

periods, Dr. Rosenthal diagnosed her as having schizoaffective disorder.   Dr. Rosenthal also diagnosed Poe as suffering from borderline personality disorder.

23.    Poe was hospitalized in April 2005 and received a series of eight electroconvulsive treatments over the next few weeks.   Her initial response was positive, but the remission of her depression was short-lived.   By August, she was once again having thoughts of injuring herself.   When Poe began to "practice" taking small overdoes of medication in early October 2005, Dr. Rosenthal admitted her to Parkland Memorial Hospital for in-patient treatment.   She was hospitalized briefly and then received intensive outpatient day treatments.

24.    Poe applied for disability benefits with the Social Security Administration.    In connection with her application, Poe underwent a psychological evaluation by Dr. J. Lawrence Muirhead on March 7, 2006.   Dr. Muirhead performed his evaluation at the request of the Disability Determination Division of the Social Security Administration.   He concluded that her bi-polar disorder was in partial remission.

25.    Nonetheless, in April 2006, the Social Security Administration notified Poe that it had found her to be disabled beginning on November 2, 2004. Poe became entitled to monthly disability benefits beginning in May 2005.   Poe was to receive an initial lump-sum payment for money due for May 2005 through March 2006.   Beginning in April 2006, Poe was to receive $1,414 each month in disability payments from the Social Security Administration.

26.    Since January 2005, Poe has seen Dr. Rosenthal every two weeks.

Dr. Rosenthal testified, credibly, that Poe's illness has grown more severe and disabling with the passage of time. It was Dr. Rosenthal's opinion that that Poe is incapable of working at the time of trial.

27.     With respect to her prospects of future employment, Poe is taking an enormous amount of psychotropic medication. Dr. Rosenthal testified that most patients require fewer drugs than Poe and can control their illness at lower dosages. It was Dr. Rosenthal's opinion that, in addition to Poe's other problems, Poe's many medications impair her ability to do high-level cognitive work and cause her to process information very slowly. Although Dr. Rosenthal testified that Poe was doing "a little better now" and might be able to hold a low-level clerical job in the next year, he did not believe that Poe will ever be able to perform as a mid-level bank executive.

28.     Prior to the trial of the instant adversary case, ECMC hired Dr. Mitchell H. Dunn to interview Poe and offer an opinion on her psychiatric illness and disability. Dr. Dunn is board certified by the American Board of Psychiatry and Neurology and has added qualifications in forensic psychiatry. Following an interview of Poe on May 25, 2006, and based on a review Poe's medical history, Dr. Dunn produced a written opinion in which he attempted to apply the legal standards for discharging a student loan to the facts of this case.

29.     At trial, Dr. Dunn agreed with Dr. Rosenthal that Poe was presently unable to work. However, Dr. Dunn testified that, in his opinion, Poe's various illnesses will not prevent her from working in the future. Dr. Dunn testified,

generically, that it is not unusual for someone with bi-polar disorder to return to previous level of function and to experience long "good" periods.

30.     Poe has never been married and has no dependants.  She lives alone. She maintains no active friendships.  Poe's mother lives in the Texas panhandle, and Poe speaks with her daily by telephone.  Poe's primary forms of recreation are reading books and watching television.

31.     Poe testified that she can see herself working in a clerical position at some point in the future.  However, as of the time of trial, Poe had not searched for a new job.  She testified that she did not feel that she was ready to return to work – she testified, credibly, that she was still having thoughts of killing herself and was still hearing voices.  Poe testified, credibly, that the requirement to repay her student loans makes her feel overwhelmed and has caused her to have suicidal thoughts.

**B. Loan History**

32.     In connection with her master's degree, Poe borrowed approximately $65,000 to pay for her tuition and expenses.  The original promissory notes were lost or damaged.  However, the evidence presented by ECMC at trial established that two loans were made to Poe – one for approximately $36,130, and another for approximately $29,168.  The American Education Services/Pennsylvania Higher Education Assistance Agency ("AES/PHEAA"), which had guaranteed both loans, subsequently acquired the loans and assigned its right, title and interest in and loans to ECMC.

33.     Poe began making regular monthly payments on her student loans in May 2000.  The balance of her student loans at that time was $65,298.73.  She continued making payments on both loans through October 2001.  From October 2001 through May 2002, Poe made monthly payments on the larger of the two loans.  In summary, Poe made 25 payments of $207.59 on the larger loan (for a total payment of $5,189.75) and 18 payments of $167.59 on the smaller loan (for a total payment of $3,016.62).

34.     ECMC did not invite Poe to participate in any income contingent repayment plan prior to her bankruptcy, and Poe was unaware of such programs.  At trial, Poe could not recall whether AES/PHEA or ECMC had made any collection efforts prior to her bankruptcy or whether she had requested AES/PHEA or ECMC to allow her to defer the repayment of the loans.  Following her bankruptcy, companies holding Poe's other student loans contacted her seeking to collect the debt.

### C. Income and Expenses

35.     Poe's annual salary increased while she was employed by J.P. Morgan Chase Bank.  She began working for the bank in April 2000, and her gross annual income was $37,444.88 for that year.  Her gross annual income was $47,492.79 in 2001; $52,208 in 2002; and $52,500 in 2003.  Poe took a medical leave of absence from her job in November 2004, and her gross annual income for that year was $49,693.  Her gross annual income was $17,349 in 2005.

36.     When Poe filed for bankruptcy protection in August 2004, Poe was still employed by the bank, her net monthly income was $3,260, and her total monthly expenses were $3,268.  Her monthly income decreased after she took a leave of absence from her job in November 2004.  Poe subsequently lowered her expenses by selling the condominium in which she had been living, among other things.  Poe did not receive any profit from the sale of her condominium.

37.     Poe's total monthly expenses were $2,448.67 at the time of trial. These monthly expenses included $599 for rent for an apartment; $245 for utilities; $399.67 for repayment of a loan used to purchase a 2003 Honda Civic; $375 in medical expenses; $230 for health and automobile insurance; $100 for transportation (not including car payments); $30 for telephone service; $50 for cellular phone service; $25 for legal fees relating to this adversary case; $20 for hair cuts at Supercuts; $20 for laundry and dry cleaning; and $350 for food.  With respect to her food expense, Poe testified that she is a poor cook and tends to purchase prepared and processed food.

38.     Poe testified that her monthly rent would increase to $629 in July 2006.  Additionally, Poe has been unable to pay for some post-petition medical treatments and has incurred debts to numerous medical providers.  The $375 budgeted for Poe's monthly medical expenses was based on her memory of what she spends out-of-pocket for medications as well as what she was paying for debts relating to post-petition medical treatments.  Poe testified that $375 was not really enough to cover these expenses.  In addition, Dr. Rosenthal has recommended

treatments that would cost Poe more than $3,000 out of her own pocket, none of which was included in her current monthly budget.

39.    The monthly expenses listed in Poe's current Schedule J do not include some of the expenses this Court regularly sees, such as clothing, household maintenance and renter's insurance.  These expenses were included in Poe's original Schedule J.

40.    At the time of trial, Poe was receiving $2,333.34 in income each month, which included $1,414 in disability payments from the Social Security Administration and approximately $900 in private disability benefits from Unum Provident Corporation ("Unum").  Poe testified that her entitlement to private disability benefits from Unum will end on April 30, 2007.

41.    At the time of trial, Poe was indebted to ECMC in the approximate amount of $78,356.60.[4]  According to the repayment summaries introduced by ECMC at trial, if Poe were to repay the loan under a standard plan, her initial monthly payment would be $899.72 (over 10 years at 6.75% interest) based on an adjusted gross income of $28,000.  In contrast, the initial monthly payment under an income contingent plan would be $307.17 (over 25 years at 6.75% interest), and the initial monthly payment under a graduated repayment plan would be $449.86 (over 30 years at 6.75% interest) based on an adjusted gross income of $28,000.

---

[4] Poe also owes approximately $12,000 for two additional student loans that are not the subject of this adversary proceeding.

42.     At trial, the Court observed that Poe did not sit with her attorney. Poe sat in the public gallery with her head down during the trial.  Her movements during her own testimony were slow, and she avoided looking directly at anyone.

### III. CONCLUSIONS OF LAW

1.     Poe filed for bankruptcy and initiated this adversary proceeding prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  The Court, therefore, looks to pre-BAPCPA law in determining the dischargeability of Poe's student loans.

2.     Section 523(a)(8) of the Bankruptcy Code provides that bankruptcy does not discharge a debtor from a debt for "a loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit ... unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents."  As the statutory text suggests, a discharge of a student loan is possible if a debtor can demonstrate, by a preponderance of the evidence, that to hold the student loan non-dischargeable would impose an "undue hardship" upon him and his dependents.

3.     There is no precise definition of the term "undue hardship."  It is not defined in the Bankruptcy Code nor has any particular judicial definition been endorsed by the United States Supreme Court.  *Kettler v. Great Lakes Higher Educ. Serv. Corp. (In re Kettler)*, 256 B.R. 719, 722 (Bankr. S.D. Tex. 2000). Most courts, however, have endorsed a three-prong test articulated by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Serv. Corp.*,

831 F.2d 395 (2nd Cir. 1987), under which a debtor is required to show that: (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loan; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) the debtor has made good faith efforts to repay the loan.  *Id*. at 396.

4.      This test was expressly adopted by the Fifth Circuit in *In re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003). Thus, this Court reviews Poe's evidentiary presentation in light of the *Brunner* factors in order to determine whether she has met her burden to demonstrate the existence of an undue hardship.

## A. First Prong

5.      The first element of the *Brunner* test requires a determination of what constitutes a "minimal standard of living."  While a precise definition has yet to be provided, "[c]ourts universally require more than temporary financial adversity and typically stop short of utter hopelessness." *Nary v. The Complete Source (In re Nary)*, 253 B.R. 752, 761 (N.D. Tex. 2000) (quoting *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 437 (6th Cir. 1998)). "Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy.  On the other hand, the Bankruptcy Code does not require that the debtor live in abject poverty before a student loan may be discharged." *Yapuncich v. Montana Guaranteed Student Loan Program (In re Yapuncich)*, 266 B.R. 882, 888 (Bankr. D. Mont. 2001) (internal quotations omitted).

6.      In the present case, as previously discussed, Poe was unemployed at the time of trial.  She was receiving $2,333.34 each month in disability payments from the Social Security Administration.  Her monthly expenses, exclusive of student loan payments, totaled $2,448.67 at the time of trial.  Assuming an adjusted gross income of $28,000, Poe's monthly payment to ECMC for her student loans would be an additional $307.17 (over 25 years at 6.75% interest) under an income contingent repayment plan.  However, Poe's expenses already exceeded her income at the time of trial, and she anticipated that her monthly disability payment would decrease to $1,414 beginning in May 2007.

7.      Poe's expenses, when considered as a whole, are understated.  The only expense that may decrease in the future is the amount budgeted for her car payment.  As her car ages, however, her maintenance costs are likely to increase and she will eventually need a new vehicle.  Further, Poe's present schedule of monthly expenses does not include any expenses relating to household maintenance (which Poe appears to have included in her food budget), clothing or renter's insurance.

8.      ECMC asserted that Poe spends too much for cable television, her cell phone and food.  The suggestion is that the loss or reduction in amount of such things would not be an undue hardship.  In support of its arguments, ECMC introduced the IRS Collection Standards into evidence.

9.      While this Court is not bound by the IRS Collection Standards in determining what constitutes a minimal standard of living, *see, e.g., In re Albee*,

338 B.R. 407 (Bankr. W.D. Mo. 2006), it appears that Poe has claimed far less in expenses than she would be allowed under the IRS Collection Standards.  For example, her allowable cost for apparel and services, which is currently $20 for laundry and dry cleaning, would increase to $75.  Her allowable cost for personal care products and services, which is currently $20 for hair cuts, would increase to $27.  Under the IRS Collection Standards, Poe would be entitled to miscellaneous expenses of $108.  As a resident of Collin County, Texas, Poe's allowable cost for housing and utilities, which is currently $904 (including her cell phone cable bills), would increase to $1,500.  Her allowable transportation cost, which is currently $100, would increase to $309 under the IRS Collection Standards.

10.    The analysis of the first prong of the *Brunner* test is factually intensive.  In this case, (i) Poe is socially isolated, (ii) one of Poe's only social contacts is her mother, who she speaks with daily by telephone, (iii) watching television is one of Poe's only forms of entertainment, (iv) Poe copes with her depression by over-eating, (v) Poe's overall expenses fall short of the expenses allowed under the IRS Collection Standards, (vi) Poe's overall expenses are understated and (vii) Poe has significantly reduced her monthly expenses since filing for bankruptcy.  Additionally, Poe has a long-standing psychological illness that has caused her to attempt suicide multiple times and has occasionally required hospitalization.

11.    Even if Poe were to reduce the expenses challenged by ECMC, Poe's monthly expenses would exceed her income if she were forced to make monthly

payments to ECMC under an income contingent repayment plan (which was the least expensiv repayment option described by ECMC at trial).   Since Poe's monthly expenses would substantially exceed her monthly income if forced to repay the student loan, she has successfully shown that she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if she is forced to repay the student loan.   *Gerhardt*, 348 F.3d at 92. The Court, therefore, finds and concludes that that Poe has satisfied the first prong of the *Brunner* test.

### B.  Second Prong

12.    The second prong of the *Brunner* analysis considers the likelihood that the debtor's financial situation will improve sufficiently in the future to permit him to resume the payment of his educational loans, *United States Dept. of Education v. Wallace (In re Wallace)*, 259 B.R. 170, 181 (C.D. Cal. 2000).  The second prong is "intended to effect the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt."   *United Student Aid Funds, Inc. v. Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (9th Cir. B.A.P. 1999).  This factor "more reliably guarantees that the hardship presented is 'undue.'"   *In re Elmore,* 230 B.R. at 27 (citing *Brunner*).

13.    In this case, the experts for Poe and ECMC agree that Poe has a serious medical condition that is likely to persist for the foreseeable future.  Even if Dr. Dunn is correct in his conclusion that Poe suffers from bi-polar disorder

(rather than schizoaffective disorder), there is no dispute that bi-polar disorder is not a condition that will abate with time.  Further, as other courts have recognized, bi-polar disorder can, in severe enough cases, affect a person's ability to obtain and thereafter retain employment.  *See Leatherwood v. Houston Post Co.,* 59 F.3d 533 (5th Cir. 1995) (bi-polar disorder may impair the ability of an individual to perform their job duties); *Doherty v. United Student Aid Funds, Inc.,* 219 B.R. 665 (Bankr. W.D.N.Y. 1998) (bi-polar disorder may present circumstances sufficient to discharge a student loan under § 523(a)(8)); *Taylor v. Phoenixville School Dist.,* 174 F.3d 142 (3rd Cir. 1999) (bi-polar disorder is a disability under the ADA).

14.     The primary thrust of Poe's argument in support of the second prong of the *Brunner* analysis is that her psychological problems are responsible for her present financial plight and will continue to interfere with her ability to maintain professional employment for the foreseeable future.  Poe argued that, at best, she may be able to work in a clerical position at some point in the future.  Even if she is able to hold a position similar to those she held prior to obtaining her MBA, Poe asserted that such a position will not allow her sufficient income to repay her debt to ECMC.

15.     It is appropriate to consider a debtor's disease or disability as a factor in the determination of undue hardship, because it may affect an individual's ability to work. *In re Reynolds,* 425 F.3d 526, 533 (8th Cir. 2005).  Further, where the evidence establishes that financial obligations "are likely to undermine a debtor's health, which, in turn will affect the debtor's financial outlook" it is

appropriate to take such facts and circumstances into account. *Id.* For example, in *Reynolds,* the court noted the debtor's diagnosis of major depressive disorder and fragile mental health when affirming the discharge of student loan debt. *Id.* In *In re Ratzsch,* 325 B.R. 812, 816 (Bankr. N.D. Iowa 2005), the court allowed student loan debt to be discharged where the debtor had received disability benefits for more than 10 years, health problems from obesity were likely to continue and the debtor had a subsistence level of income and maintained a minimal standard of living. *See also, e.g., In re Anelli,* 262 B.R. 1, 9 (Bankr. D. Mass. 2000) (finding a debtor unable to generate income given numerous medical ailments including chronic fatigue syndrome, arthritis, fibromyalgia and depression).

16.    Here, at the time of trial, Poe was unemployed, received disability benefits from the Social Security Administration and Unum, and (at least occasionally) received additional financial support from her family. Prior to obtaining an MBA, she maintained a full-time clerical job for a number of years. Her psychological problems are longstanding. Her psychological condition began to worsen after graduating from the MBA program and obtaining a salaried, professional position at J.P. Morgan Chase Bank. Her psychological condition improved somewhat after Poe left her job at the bank, but remained serious enough to cause her auditory hallucinations and to also require her confinement to a hospital on numerous occasions.

17.    Poe testified that the requirement to repay her loans to ECMC causes her to have suicidal thoughts. Poe testified, credibly, that she had suicidal

thoughts as recently as two days before trial. In addition, she testified that the medications she now takes to keep her condition under control, although beneficial, causes her not to be able to think clearly -- a fact which was corroborated by during the neurological examination by Dr. Cobb. Consequently, while the Court does not find that Poe is entirely unemployable, the Court, given the foregoing considerations, holds that Poe has established that her various psychological disorders are, together, severe enough to significantly impair her present ability to maintain full-time permanent employment.

18.    With respect to whether Poe's employability and financial situation will improve in the future, Dr. Dunn agreed with Poe and Dr. Rosenthal on several points. Dr. Dunn agreed that Poe's psychological disorders are permanent. Dr. Dunn also agreed that Poe was presently unable to work due to her acute depression and that Poe's borderline personality disorder is likely to impede good social functioning. Dr. Dunn disagreed, however, with Dr. Rosenthal's diagnosis that Poe suffers from schizoaffective disorder

19.    Dr. Dunn rejected Dr. Rosenthal's diagnosis of schizoaffective disorder, since that diagnosis is "inconsistent" with Poe's prior diagnosis of bi-polar disorder. Based on his brief interview of Poe and a review of her medical history, Dr. Dunn concluded that Poe suffers from bi-polar disorder. Dr. Dunn testified that, although Poe is presently experiencing a "low" period, individuals suffering from bi-polar disorder often recover and function well during "high" periods. Additionally, in his written opinion and testimony, Dr. Dunn generally

asserted that if Poe's obligation to repay her student loans were "resolved," she would be able to work "and make a salary that would allow for loan repayment."

20.    Dr. Dunn failed to address whether or to what extent Poe's condition might have worsened over time.  He also did not address how Poe's disorder will affect her ability to obtain and retain professional employment throughout the cycles of "highs" and "lows" that he testified characterize bi-polar disorder. Perhaps more importantly, Dr. Dunn's generic testimony regarding high-functioning periods is not supported by the evidence in this particular case.  Poe established that she has not experienced any "high" periods for at least the past several years.  Dr. Rosenthal, her treating physician, testified that Poe has not experienced a "high" period since he began treating her in January 2005.

21.    The record reflects that Poe's illness has spiraled into depression each time she faced challenges at work.  Poe testified that she was overwhelmed by her first job at Shell Oil Company after graduating from college in 1989.  After receiving an MBA and obtaining a job at J.P. Morgan Chase Bank, the loss of Poe's "fatherly" supervisor and the different expectations of a new supervisor triggered hospitalizations for depression in December 2001 and August 2002.  Poe was subsequently assigned to help prepare reports for the bank.  When Poe was reassigned to work in derivative accounting in or around 2004, Poe once again felt overwhelmed and depressed, and she began making suicide attempts. Dr. Rosenthal testified that Poe was doing better at the time of trial, but that improvement occurred only after Poe left her job with J.P. Morgan Chase Bank.

She was not working *and* doing better.

22.     The Court finds that Poe will likely continue to experience problems in finding and then retaining full-time permanent employment – especially employment in responsible, professional positions.  Poe's psychological condition has grown more severe with the passage of time and she not experiencing "high" periods – and certainly not any lengthy high periods – during which she might be able to obtain and maintain professional employment.  Assuming that Poe does experience "high" periods at some point in the future, Poe's medical and employment history indicate that she is likely to be unemployed during "low" periods and to accumulate debts that may precipitate another bankruptcy filing.

23.     The Court concludes that this evidence suffices to demonstrate that Poe's psychological problems can be expected to persist for a substantial portion of the education loan repayment period.  Her psychological problems are well-documented and have existed for a significant portion of her life.  In short, Poe's psychological disorder and her lack of self-confidence render her unfit for the higher responsibility and higher paying jobs that her education would seem to command.

24.     The parties agree that Poe might, at some point in the future, be able to work in essentially a ministerial position.  Assuming that Poe is able to return to a full-time clerical position such as the one she held at the architectural firm and that she is willing to work overtime, Poe might make $30,000 a year, or a gross salary $2,500 a month, at some point in the future.  Under this scenario, Poe's

monthly expenses of $2,448.67 would exceed her net income, after taxes. Poe would not earn enough to make even modest payments on her debts to ECMC.

25.     For all the foregoing reasons, the Court holds that Poe has met her burden of demonstrating that the second prong of the *Brunner* test is satisfied.

## C. Third Prong

26.     Finally, the third inquiry under the *Brunner* test is whether the debtor has made a good faith effort to repay his student loan. This aspect recognizes that undue hardship "encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Stein v. Bank of New England (In re Stein)*, 218 B.R. 281, 288 (Bankr. D. Conn. 1998). "Factors to be considered include the number of payments the debtor made, attempts to negotiate with the lender, proportion of loans to total debt, and possible abuse of the bankruptcy system." *In re Wallace*, 259 B.R. at 185

27.     In this case, Poe paid approximately $8,000 on her student loans over a period of two years. She ceased making payments as her psychological conditions worsened. Poe admits that she never attempted to negotiate an income contingent repayment plan with ECMC. To the extent ECMC argues that Poe's failure to investigate or use such a program evidences a lack of good faith, the Court disagrees. Section 523(a)(8) does not require a debtor to participate in an income contingent repayment plan in order to obtain an undue hardship discharge. *See, e.g., In re Carlson*, 273 B.R. 481,486 (Bankr. D. S.C. 2001) ("The Court is of

the opinion that to put a debtor to the impossible burden to seek out every possible [income contingency repayment] program in existence was not contemplated by Congress when §523(a)(8) was enacted.").[5]

28.     The Court finds and concludes that Poe has acted in good faith and that the third prong of the *Brunner* test is met.  Poe has never abandoned her obligation to repay her student loans.  She paid when he could, and her present inability to pay is not due to her own willfulness or negligence.

## IV. CONCLUSION

29.     For the foregoing reasons, the Court concludes that Poe has demonstrated, by a preponderance of the evidence, that to hold her student loan non-dischargeable would impose an "undue hardship" upon her.[6]  The Court will enter a separate judgment consistent with these findings and conclusions.

Signed on 3/15/2007

*Brenda T. Rhoades*                    MD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

---

[5] *Accord Nanton-Marie v. U.S. Dept. of Education*, 303 B.R. 228, 235 (Bankr. S.D. Fla. 2003) ("The Court is not impressed with the argument that the failure to participate in the Ford program is a bar to an undue hardship discharge.  While that program may be available, there is no section of the Bankruptcy Code that requires it as a condition precedent to an undue hardship discharge.) (citing *Korhonen v. Educational Credit Management Corp. (In re Korhonen)*, 296 B.R. 492 (Bankr. D. Minn. 2003).

[6] Although some courts have endorsed the policy of granting partial discharges of student loans, *see Barron v. Texas Guaranteed Student Loan Corp. (In re Barron)*, 264 B.R. 833, 843-46 (Bankr. E.D. Tex. 2001), the financial evidence admitted in this case would have precluded even the most nominal of payments by Poe to ECMC due to the size of the outstanding debt and her financial restrictions.